UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR No. 3:12-40-JFA |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | AND ORDER |
| ALFRED TURNIPSEED | ) | |
| _____ | ) | |

This matter is before the court on defendant's *pro se* motion for a reduction in his sentence pursuant to the First Step Act of 2018 and 18 U.S.C. § 3582(c)(1)(A) (ECF No. 523). He contends that he has suffered a major stroke, possibly due to coronavirus complications, and may die if another outbreak occurs within the prison. He also states that he is obese and has received limited medical treatment to date.

The government has responded in opposition and contends that the defendant has not had a stroke (ECF No. 529). The government states that the defendant's medical records do not support that he has in fact had a stroke or that he had tested positive for COVID-19 prior to his filing the motion for compassionate release.

In his reply to the government's response, the defendant complains that whatever is the cause of his medical condition—whether a stroke or something else—that he is still suffering from the same symptoms as an individual who has suffered a stroke. He claims he is still blind in his left eye and paralyzed down his entire left side, in addition to being illiterate and schizophrenic. As a result, he cannot take care of himself in a correctional setting.

1

The defendant raises a new claim in his reply (ECF No. 533). He contends that he is currently serving a sentence for a stacked § 924(c) conviction and that if he were sentenced today, he would receive a much shorter sentence.

The court has carefully considered the record before it and conducted an individualized analysis of the facts and issues raised by the parties. For the reasons which follow, the defendant's motion is granted in part and denied in part.

## STANDARD OF REVIEW

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *See United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson*, 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin,* 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." 18 U.S.C. § 3582(c)(1)(B); *See Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence. It was originally adopted as part of the Sentencing Reform Act of 1984.

On December 21, 2018, the First Step Act was signed into law. Broadly, the Act's goals are to reform federal prisons and sentencing laws to reduce recidivism, decrease the federal inmate population, and maintain public safety. The First Step Act also expanded the existing compassionate release provisions of federal law by allowing an inmate to move for

2

compassionate release himself, rather than allowing only the Director of the Bureau of Prisons (BOP) to do so. The relevant portion of the First Step Act, codified at 18 U.S.C. § 3582(c)(1)(A), as amended by § 603(b) of the First Step Act, provides:

> [T]he court, . . . upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) [of Title 18] to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A).

By its terms, § 3582(c)(1)(A) permits the court to reduce the defendant's term of imprisonment after considering the factors set forth in 18 U.S.C. § 3553(a) if the court first finds that (i) extraordinary and compelling reasons warrant such a reduction; and (ii) such a reduction is consistent with applicable policy statements issued by the Sentencing Commission. In addition, a district court may not grant a sentence reduction under § 3582(c)(1)(A) without considering the § 3553 factors to the extent they are applicable. *United States v. Kibble*, 992 F.3d 326, 332 (4th Cir. 2021).

In *United States v. McCoy*, 981 F.3d 271 (4th Cir. 2020), the Fourth Circuit agreed with the Second Circuit in *United States v. Brooker*, 976 F.3d 228 (2d Cir. 2020) and found that there is, as of now, no "applicable policy statement governing compassionate release motions filed by defendants under the recently amended § 3582(c)(1)(A)," and as a result, district courts are "empowered . . . to consider any extraordinary and compelling reason for

3

release that a defendant might raise." *McCoy*, 981 F.3d at 284 (citing *Brooker*, 976 F.3d at 230); *see also*, *Kibble*, 992 F.3d at 331.

A defendant's rehabilitation standing alone does not provide sufficient grounds to warrant a sentence modification. 28 U.S.C. § 994(t). Also, the defendant bears the burden to establish that he or she is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016).

When deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court generally proceeds in three steps. *See United States v. High*, 997 F.3d 181, 185–86 (4th Cir. 2021). First, the court determines whether "extraordinary and compelling reasons" support a sentence reduction. Next, the court considers whether a sentence reduction is consistent with applicable policy statements issued by the Sentencing Commission. As noted previously in this order and as set out in *McCoy*, because there is no applicable policy statement governing compassionate release motions filed by defendants under the recently amended § 3582(c)(1)(A), district courts are empowered to consider any extraordinary and compelling reason for release that a defendant might raise. Finally, if the court finds that extraordinary and compelling reasons warrant relief, the court must consider the § 3553(a) factors in deciding whether to exercise its discretion to reduce the defendant's term of imprisonment.

Even if the defendant meets the eligibility criteria for compassionate release, this court retains discretion as to whether to grant relief. *See* 18 U.S.C. § 3582(c)(1)(A) (providing the court *may* reduce the term of imprisonment) (emphasis added).

4

*Exhaustion of Administrative Remedies*

Before a court may consider a defendant's motion for compassionate release, the defendant must have completed the initial step of requesting that the BOP bring a motion on their behalf. The defendant may file a motion with the court after (1) fully exhausting all administrative rights to appeal; or (2) after the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier. 18 U.S.C. § 3582(c)(1)(A). *See United States v. Muhammad*, __ F.4th __, 2021 WL 4888393, at *3 (4th Cir. Oct. 20, 2021).

The government concedes that the defendant has fully exhausted his administrative remedies, therefore, the court will proceed to review the matter on the merits.

In his motion, the defendant asserts two grounds for relief. First, he contends that his medical condition, coupled with the ongoing COVID-19 pandemic, necessitates his immediate release. Second, he contends that the First Step Act, combined with the Fourth Circuit decision in *McCoy*, require the court to "unstack" his convictions under 18 U.S.C. § 924(c). The court will address these two issues in turn.

I. Motion for Compassionate Release for Medical Conditions

The mere existence of the COVID-19 pandemic—which poses a threat to every non-immune individual in the world—cannot independently provide a basis for a sentence reduction or justify compassionate release. However, COVID-19 is certainly relevant to the court's analysis of a § 3582(c)(1)(A) motion for compassionate release. If a defendant has a chronic medical condition that has been identified by the Centers for Disease Control

(CDC) as elevating the inmate's risk of becoming seriously ill from COVID-19, it is possible that such medical condition could satisfy the extraordinary and compelling reasons standard. As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020).

Rather, the threshold questions are whether the defendant has a particularized risk of contracting COVID-19 in prison and whether his medical conditions render him particularly susceptible to severe illness or death should he contract the virus. *See United States v. Youngblood*, No. 20-7836, 2021 WL 4167105, at *2 (4th Cir. Sept. 14, 2021) (citing *United States v. High*, 997 F.3d 181, 185 (4th Cir. 2021)).

The defendant contends that he has lead a life limited by various mental health and intellectual challenges. He contends that he suffered a "major stroke" during the most recent Coronavirus outbreak at Federal Correctional Institution Edgefield (FCI) where he is housed. He says that because of the Bureau of Prison's (BOP) failure to properly treat him, he will never fully recover from his stroke. Additionally, he contends he is in immediate danger of suffering more strokes, any one of which could likely kill him. He also contends he is obese and is gaining weight rapidly. He states that his blood pressure has risen dramatically and he experiences painful cramps on the unparalyzed side of his body due to the strain. In a later filing with the court, the defendant contends that he is unable to see out of his left eye, walk more than four feet, and cannot dress or feed himself. The defendant received his first COVID-19 vaccination on August 18, 2021, and his second dose on September 9, 2021.

6

In response, the government contends that the defendant's medical records do not support his allegations that he has suffered a stroke (ECF No. 529, Ex. 1). The government also contends that the defendant has been uncooperative with medical professionals at the BOP, refusing to follow a recommendation that he move to a lower tier cell and bunk. It is also alleged that the defendant has refused "certain labs" that were recommended by the medical staff. The government points out that on one occasion, the defendant was seen holding a stress ball in his left hand, which conflicts with his contention that the stroke has afflicted his left side and rendered him permanently paralyzed. In contradiction to his contention that he is unable to walk, the defendant has been observed walking without assistance. Finally, the government points out that the defendant has not tested positive for COVID-19.

In light of the conflicting positions taken by the parties in their briefs, this court has carefully analyzed the voluminous medical records provided by the BOP and attached to the government's sealed response. It does appear in at least one of these records, a plan of care dated January 4, 2021, indicates that the defendant has a near total hempiaresis of "unknown etiology." The report also indicates that "his prognosis at this time does not look promising." This document (ECF No. 529-1) indicates that the defendant claims that he has difficulty standing, walking, and using his upper or lower body for tasks such as dressing or bathing.

It thus appears that the government has understated the defendant's medical condition. Nevertheless, after this court's careful review of the extensive medical file provided by the BOP, the court concludes that the defendant has not demonstrated that his medical condition

constitutes an "extraordinary and compelling reason" for his immediate release. It appears that most of the conditions alleged by the defendant are adequately controlled at the BOP and that, to the extent he is partially paralyzed, this is not life threatening. Nor does the court find that any of the defendant's current conditions are exacerbated by the current COVID-19 pandemic.

For the foregoing reasons, this court determines that the defendant has not demonstrated that his medical condition, even in the era of COVID-19 concerns, rises to the level of extraordinary and compelling reasons warranting his immediate release.

Alternatively, even if the court were to make such a finding, this court would nevertheless deny the defendant's motion for compassionate release after carefully considering the § 3553(a) factors, the defendant's post-sentencing conduct, and the totality of the circumstances based upon this court's individualized assessment of the defendant's situation. The § 3553(a) factors and post-sentencing conduct are addressed in the second portion of this order.

II. § 924 Stacking Claims

In § 403 of the First Step Act of 2018, Congress amended 18 U.S.C. § 924(c) so that it does not apply unless a defendant had a previous, final conviction for a § 924(c) charge at the time of the offense.[1] This effectively did away with the so-called "stacking" procedure

---

[1] Based on this amendment, § 924(c)(1)(C) now provides: "In the case of a violation of this subsection that occurs after a prior conviction under this subsection has become final, the person shall – (i) be sentenced to a term of imprisonment of not less than 25 years. . . ." The other provisions of § 924(c), including those requiring a 7 year mandatory minimum term for brandishing a firearm in relation to a crime of violence, and directing that each sentence under § 924(c) must run

that had been followed by the district courts across the country for many years.  The First Step Act expressly provided that this change in the law was *not* retroactive.

In *United States v. McCoy*, 981 F.3d 271 (4th Cir. 2021), however, the Fourth Circuit Court of Appeals indicated that the former practice of stacking § 924(c) convictions could be considered in a fresh look at sentencing under motions brought pursuant to § 3582(a)(1)(C) of the First Step Act.

*McCoy* was perhaps the most significant sentencing decision handed down by the Fourth Circuit in recent years.  In that decision, the Court discussed at length the changes related to sentences under § 924(c) prior to and subsequent to the First Step Act. Specifically, prior to enactment of this landmark legislation, a conviction under § 924(c) was treated as "second or subsequent" (thereby triggering the 25-year mandatory minimum sentence) even if the first § 924(c) conviction was obtained in the same criminal case.  The First Step Act ended this practice known as "stacking" by clarifying that the 25-year mandatory minimum applies only when a prior § 924(c) conviction arises from a separate criminal case and has already become final.  As summarized by the Fourth Circuit, "Under Section 403 of the First Step Act . . . the 25-year mandatory minimum is 'reserved for recidivist offender, and no longer applies to multiple § 924(c) convictions obtained in a single prosecution.'"  *McCoy*, at 275 (quoting *United States v. Jordan*, 952 F.3d 160, 171 (4th Cir. 2020)).

---

consecutively to any other sentence imposed, remain unchanged.

9

Notwithstanding the statutory language making the anti-stacking provision non-retroactive, the Court held that a defendant seeking reconsideration of his sentence could assert that the First Step Act's revised sentencing law in § 924(c) convictions may meet the "extraordinary and compelling" standard in compassionate release motions.

Finally, and most importantly, the *McCoy* Court stressed the "severity of [the] § 924(c) sentence, combined with the enormous disparity between that sentence and the sentence that a defendant would receive today." *Id*. at 285.

PROCEDURAL HISTORY

*The Offense Conduct*

On January 18, 2011, officers with the Columbia Police Department responded to a call regarding an armed robbery at Wild Wing Café located on Bower Parkway in Columbia, South Carolina. Officers interviewed the restaurant manager who provided a detailed account of the robbery. According to the manager, he walked outside of the restaurant through the rear exit at approximately 8:58 a.m. to throw some linens away in the dumpster behind the building. Once he was outside, he observed two black males standing beside the dumpster wearing work gloves and acting suspiciously. When he looked back at them, the manager indicated both black males, later identified as Jamario Ford and Alfred Turnipseed, rushed toward him brandishing handguns while wearing masks.

According to the manager, Ford and Turnipseed forced him back into the restaurant at gunpoint and demanded to know the location of the restaurant's safe. While continuing to brandish the weapon, Ford followed the manager to the office where the safe was located.

10

Meanwhile, Turnipseed approached another restaurant employee and instructed him at gunpoint to lie on the floor. Turnipseed then took the employee's cell phone from his pants pocket. Turnipseed then encountered Darryl Wright, one of the co-defendants, and instructed Wright at gunpoint to lie on the floor. Turnipseed subsequently patted Wright down and felt his wallet and cell phone but did not take them. Wright later advised the officer he could hear Ford yelling at the manager saying, "Hurry or I will shoot you". The manager was able to open the restaurant safe and gave Ford all of the money inside which totaled $9,956.00. After collecting the money, Ford and Turnipseed fled out of the back door on foot and ran into the woods behind the other businesses in the strip mall.

On May 25, 2011, officers with the Columbia Police Department responded to a call regarding an armed robbery at the same Wild Wing Café. Upon arrival at the scene, officers made contact with the restaurant employees and witnesses who provided detailed accounts of the robbery. Thurmond Walker, an employee of a nearby business, stated he was smoking a cigarette at the rear of the business when he observed three men, later identified as Carl Wood, Jamario Ford, and Alfred Turnipseed, wearing ski masks exit from a 2006 Ford Focus. As he was approached by Woods, Ford, and Turnipseed, Walker told law enforcement that one of the men grabbed him by the neck, held a gun to his back, and yelled, "Get up, get up, come with me!," while dragging him towards the back of the business. Walker recounted Woods, Ford, and Turnipseed also grabbed Charles Mullins, who was standing in front of the door, and threw him to the ground. Walker stated while he and Mullins were being held at gunpoint on the ground, one of the robbers demanded their cell phones, and both men

complied with the demand.

After obtaining Walker's and Mullins' cell phones, Walker indicated Woods, Ford, and Turnipseed knocked on the back door of Wild Wing Café and yelled, "Truck!" so an employee would think a delivery truck had arrived. Employee Carrie Lyerly opened the door and was immediately overtaken at gunpoint by Woods, Ford, and Turnipseed. Lyerly later told officers she panicked and fell to the ground. Once the robbers entered the business with Walker, Mullins, and Lyerly being held at gunpoint, Walker told officers Woods, Ford, and Turnipseed put them in the bathroom located in the rear of the business. Once inside the bathroom, Walker related Mullins was able to lock the door. A few seconds later, one of the robbers attempted to open the door, and, upon discovering the door was locked, began yelling for them to open the door or "I'm gonna shoot this motherfucker up." Fearful for his life, Walker stated he opened the door. According to Walker, one of the robbers pushed the door open, pointed his gun at them, demanded they be quiet, and shut the door back. Approximately five minutes later, Walker indicated Mullins left the bathroom, saw the robbers had left, and called the police.

Brian Neal, a manager at Wild Wing Café, stated he walked into the manager's office at approximately 9:00 a.m. on the morning of the robbery to do paperwork. Approximately five minutes later, Neal heard a knock at the backdoor and witnessed Lyerly walk to the door to open it. Neal stated he heard "hollering" at the back door but did not think much of it due to the fact it seemed normal in the regular work atmosphere. A few seconds later, Neal related his office door was forced open, and Neal saw a black male pointing a nickel-plated

revolver towards his head. The man told Neal to open the safe. Neal stated he entered the safe's combination incorrectly during the first two attempts. Neal indicated he became nervous as he knew if he entered the combination incorrectly for a third time, the safe would lock him out. Neal explained this issue to the robber and told him he needed to calm down so he could successfully open the safe. The robber lowered his gun from Neal's head and stepped back. Neal successfully opened the safe and gave the robber $5,600.00 in U.S. currency. Neal told the robber, "If you hold the bag open, I'll load all the money into it because I don't want to lose my life over this." After Neal put all the money into the canvas bag, the robber exited the office and another black male came in and knocked down all the computers, telephones, and everything on the countertops.

Paul Chimel, the restaurant manager, told responding officers he was in the kitchen when Turnipseed, came in with a gun and told him to get on the ground. Chimel advised Turnipseed attempted to disguise his voice because he (Turnipseed) was formerly employed at Wild Wing Café and had a speech impediment which would give away his identity. After Ford, Turnipseed, and Woods fled the business, Chimel indicated he locked the back door, exited through the front door of the business, and walked to his vehicle to call law enforcement.

As part of their active investigation into the Wild Wing Café robberies, the police "pinged" the cell phones which were stolen from the May 25, 2011 robbery. The phones were found later that day and the police found a fingerprint on one of the phones and were able to determine that it belonged to Woods. The police began looking for Woods but were

13

unable to find an address for him; however, on June 14, 2011, Woods, Ford and Turnipseed, were arrested for an armed robbery of a Bi-Lo grocery store in Columbia.

On June 14, 2011, officers with the Columbia Police Department responded to a call regarding an armed robbery at Bi-Lo located in Columbia, SC. After interviewing victims and witnesses on the scene, investigators learned three armed men, later identified as Woods, Ford, and Turnipseed entered the store and demanded cell phones from customers and employees before taking approximately $2,095.00 from the money office. Surveillance video captured Ford carrying out the white garbage bag filled with money and stolen goods. During the course of the robbery, a witness stated she heard a gunshot fired while she was in the store. Another witness provided officers with a description of the getaway vehicle as a white Mitsubishi missing a right front hubcap.  Based on that description, CPD officers dispatched all officers in the area to be on the lookout for the car.

CPD Master Police Officer (MPO) Robert Uhall was in the immediate area of the robbery when he heard the dispatch officer advised of a pending call referencing a man with a gun at 4000 Plowden Road in Columbia, SC. MPO Uhall answered the call and responded to the Columbia Gardens Apartment Complex located on Plowden Road. As he was patrolling the area near building 29, MPO Uhall found the neighborhood to be quiet and cleared the dispatch call as unfounded. Before leaving the apartment complex, MPO Uhall observed a white Mitsubishi Mirage in front of building 19 which matched the description of the vehicle used to drive away from the Bi-Lo armed robbery. MPO Uhall inspected the vehicle and observed black clothing on the front passenger floor board covering up what

appeared to be a silver handgun with gray duct tape wrapped around the handle. MPO Uhall called dispatch for assistance, and additional officers arrived to set a perimeter around the area.

While securing the area, MPO Uhall was approached by a woman who told him she saw three black males exit the Mitsubishi Mirage and enter an unknown apartment in building 19. CDP officers made contact with the residents in building 19 and eliminated several of the apartments as suspected hiding places for the robbers. MPO Uhall knocked on the door at apartment E in building 19 and waited several minutes before a pregnant woman, later identified as Tila Terry, opened the door. When asked if she was the only person in the apartment, Terry told him there was no one in the apartment other than herself. While looking over Terry's shoulder, MPO Uhall was able to see a black male with shoulder length dreadlocks, later identified as Woods, standing in the hall.

Fearing Terry may have been being held against her will, MPO Uhall pushed open the door and ordered Woods to the ground. As MPO Uhall was handcuffing Woods, Ford and Turnipseed came into the room and were arrested.

CPD officers obtained and executed a search warrant on Apartment 19E. During the search, officers located the following items: (1) a Harrington and Richardson 12 gauge shotgun bearing serial number BA541415 and a Stevens and Tool 12 gauge-shotgun bearing serial number 63681 inside a kitchen closet; (2) a white trash bag containing $2,067.00 in U.S. currency, 19 packs of Swisher Sweets cigarillos, 8 packs of Swisher Sweets blunts inside the kitchen closet; (3) two pair of black Nike tennis shoes, a pair of black pants, and

15

a black ski mask inside a bedroom closet; (4) two packs of Newport cigarettes and a roll of gray duct tape in the top left drawer of a bedroom dresser; (5) a 9mm Hi-Point semiautomatic firearm, bearing serial number P072969 with one round of 9mm Luger ammunition in the chamber and two rounds of 9mm Winchester ammunition in the magazine on a bedroom floor; and (6) a black ski mask in a box on the top shelf of a shelving unit in the living room. During a search of the Mitsubishi Mirage, CPD officers discovered the following items: (1) a .357 caliber Smith & Wesson revolver, Model 65-2, bearing serial number 1D52831 located on the front passenger floor board; (2) a black thermal shirt, a black ski mask, black sock stockings, a black baseball cap, and a pair of blue latex gloves located on the front passenger floor board.

Following his arrest, Turnipseed was advised of his Miranda warnings and provided the following written statement to investigators:

> At 5 a.m., Q (Woods) came to my house and mom said he at the door. I got up went to the door, and he say Jamario want me. I put some close on and went. When I got there Jamario say U ready to pay dat money. I don't have it. He say I want and need my money. So go home and get some close and come on we going to get it. They have guns so I'm scared and I go. We go and I say I can't do it. They left and met bugg. He got in. He say I got no close. Jamario say give him your shirt and shoes. I did and went that way to bilo. Q was driving Jamario in the passenger. Me and the other guy in the back. They pull up, went it. I got behind the driver seat then they came out go in and pull away. Went to Tila house. Got out wit bag and went in. They made me go. I didn't want to. Jamario had a silver gun and Q had a black 1. I don't know what bugg have and Tila had nothing to deal with it. Jamario tried to make me go cause I owe him money for my bond. Please don't tell them I told.

Turnipseed identified "Q" as Carl Woods and "Jamario" as Jamario Ford. Turnipseed further stated the group used a "4 door white little car" to commit the robbery. Turnipseed

claimed Ford initially told him on June 11, 2011, he wanted his (Turnipseed's) help to rob the Bi-Lo. According to Turnipseed, Ford advised he, Wood, and Turnipseed would participate in the armed robbery. After Woods parked the car in front of the grocery store, Ford told the group "what they gone do and where to go." Turnipseed indicated they put on masks before getting out of the car. Turnipseed asserted Ford instructed "Don't open that door and go in the back room" when the police arrived at Terry's apartment after the robbery.

On June 15, 2011 and February 17, 2012, Wright was interviewed concerning his knowledge of and involvement in the armed robberies of the Wild Wing Café. According to Wright, he was at the home he shared with Albert Wallace, Ford, Turnipseed, and Woods during the first week of January 2011. He stated they were just hanging out drinking and smoking marijuana and began to discuss how "gravy" (easy) it would be to commit a robbery at Wild Wing Café, Wright's and Wallace's place of employment.

Wright told the group the restaurant did not have a working security camera system. Wright further provided information as to when the business opened, who was typically inside the business during the early morning hours, and the location of the manager's office and where the money was kept. Wright told the group employees usually arrived at 9:00 a.m. to prepare for the day and to accept deliveries. Wright advised Turnipseed previously worked at the restaurant and had some knowledge of how the business operated. Wright stated on or about January 18, 2011, he was contacted by Turnipseed and Ford, who told him they and Wallace were planning on robbing the Wild Wing Café. Ford and Turnipseed told Wright to "not know nothing." According to Wright, they instructed him to answer the rear door, which

17

was often used for deliveries, when they knocked on it. On the morning of the robbery, Wright indicated the restaurant manager exited the rear door to dispose of dirty linens in the dumpster located behind the business. When the manager exited, Wright stated Turnipseed and Ford were in the back preparing for the robbery. Wright assumed they were not ready to commit the robbery, as Turnipseed did not have his mask on at the time the manager exited; however, Wright stated when the manager made contact with them, Ford and Turnipseed pointed their firearms at him and forced him back into the business. Wright stated Turnipseed was the first to enter the restaurant, pointed his firearm at him (Wright), and commanded him to lie down outside of the manager's office. Wright stated the robbery lasted for about one minute before Turnipseed and Ford fled the restaurant on foot and went back to the home he (Wright) shared with Wallace.

During the robbery, Wright stated Ford and Turnipseed removed cell phones from the manager and another employee but not from him. After his shift was over, Wright stated he went back to his home and met with Ford and Turnipseed, who paid him $500.00 in cash for his assistance in the robbery. On January 20, 2012, Albert Wallace, Jr., was interviewed concerning his knowledge of and involvement in the armed robbery of the Wild Wing Café. Wallace stated on January 18, 2011, Ford and Turnipseed arrived at his residence and told him they were going to rob the Wild Wing Café. Wallace confirmed both Ford and Turnipseed were in possession of a firearm. Wallace indicated Wright was a participant in the robbery and was supposed to open the rear door of the restaurant when Ford and Turnipseed knocked.

In summary, Turnipseed was involved with a conspiracy with Jamario Ford and Carl Woods to commit at least three armed robberies throughout the Columbia area of South Carolina. On January 18, 2011, Ford and Turnipseed robbed the Wild Wing's Café. During this robbery, they again brandished firearms to order the victims at gunpoint to move inside the store and unlawfully stole $9,956.00. On May 25, 2011, Turnipseed, Woods, and Ford entered the Wild Wing Café located on Bower Parkway in Columbia, SC. During this robbery, Turnipseed, and Ford brandished firearms to order victims at gunpoint to move from outside the store (or from the rear doorway) to inside the bathroom area. In addition to stealing these victims' cellular phones, Turnipseed, Wood and Ford unlawfully stole $5,600.00 from the restaurant. Further, on June 14, 2011, Turnipseed, Woods, and Ford entered the Bi-Lo grocery store located on Devine Street in Columbia, SC, where they forced employees at gunpoint to lay on the floor and stole their cellular phones. During the robbery, Turnipseed, Woods, and Ford took an undisclosed number of cigarette cartons and $2,095.00 in U.S. currency from the grocery store. Upon fleeing the store location, Turnipseed discharged his weapon firing one round from his firearm.

Following their arrests on June 14, 2011, Woods and Turnipseed admitted their involvement and participation in both the armed robbery of the Wild Wing Café and the armed robbery of the Bi-Lo on June 14, 2011. In the Presentence Report (PSR) (ECF No. 237), victim impact restitution amounts totaled just more than $18,000.

*The Indictment and Court Proceedings*

The defendant and four co-defendants (Carl Woods, Jamario Ford, Darrell Antonio

Wright, and Albert Wallace) were charged in a 10-count Indictment with:

| | |
|---|---|
| Count 1: | conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951. |
| Count 2: | Hobbs Act robbery on January 18, 2011, in violation of 18 U.S.C. § 1951(a) and 18 U.S.C. § 2; |
| Count 3: | using and carrying firearms during and in relation to, and did possess firearms in furtherance of a crime of violence, and did brandish said firearms, on January 8, 2011, in violation of 18 U.S.C. § 924(c)(1), (c)(1)(A)(ii) and 18 U.S.C. § 2; |
| Count 4: | Hobbs Act robbery on May 25, 2011, in violation of 18 U.S.C. § 1951(a) and 18 U.S.C. § 2; |
| Count 5: | using and carrying firearms during and in relation to, and did possess firearms in furtherance of a crime of violence, and did brandish said firearms, on May 25, 2011, in violation of 18 U.S.C. §§ 924(c)(1), (c)(1)(A)(ii) and 18 U.S.C. § 2; |
| Count 6: | Hobbs Act robbery on June 9, 2011, in violation of 18 U.S.C. § 1951(a) and 18 U.S.C. § 2; |
| Count 7: | using and carrying firearms during and in relation to, and did possess firearms in furtherance of a crime of violence, and did brandish said firearms, on June 9, 2011, in violation of 18 U.S.C. §§ 924(c)(1), (c)(1)(A)(ii) and 18 U.S.C. § 2; |
| Count 8: | Hobbs Act robbery on June 14, 2011, in violation of 18 U.S.C. § 1951(a) and 18 U.S.C. § 2; |
| Count 9: | using and carrying firearms during and in relation to, and did possess firearms in furtherance of a crime of violence, and did brandish said firearms, and cause one of said firearms to be discharged on June 14, 2011, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii), (c)(1)(A)(iii) and 18 U.S.C. § 2; and |

20

Count 10:    felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), 924(a)(2) and 924(e).

The defendant was named in Counts 1, 2, 3, 4, 5, 6, 7, 8, and 9. He pleaded guilty, pursuant to a written plea agreement (ECF No. 205), to Counts 5 and 9, both of which charged violations of § 924(c). The remaining Counts 1, 2, 3, 4, 6, 7, and 8 were dismissed on motion of the government at sentencing.

The Presentence Report (PSR) (ECF No. 237) prepared by the United States Probation Office calculated the otherwise applicable guideline range for this case, but then advised that the defendant's sentence should be driven by the statutory penalties for the counts of conviction, rather than the sentencing guidelines. Specifically, the mandatory minimum sentence on Count 5 was 7 years (84 months), and the mandatory minimum sentence on Count 9 was 25 years (300 months), with a maximum of Life, with the provision that the sentence on Count 9 must run consecutive to any other term of incarceration. The 2012 version of the Guidelines Manual was used in the calculations.

Based upon these statutory provisions, on March 13, 2013 this court sentenced the defendant to 384 months consisting of 84 months on Count 5 and 300 months on Count 9, both sentences to run consecutively. Thereafter, the government moved for a reduction of sentence and the court reduced the defendant's sentence to 324 months imprisonment (ECF Nos. 398, 400).

The defendant did not file an appeal of his conviction and judgment.

21

As noted earlier in this order, § 403 of the First Step Act amended § 924(c) to provide that the 25-year consecutive term for a successive § 924(c) offense does not apply unless the defendant had a previous, final conviction for a § 924(c) charge at the time of the offense.

If sentenced today, the defendant would face the same 7 year sentence on Count 5, but only a 10 year sentence on Count 9. The statute still requires each such sentence to run consecutively to each other and to any other sentence imposed. That means the mandatory minimum sentence on two § 924(c) counts, if charged today as in the same initial § 924(c) prosecution, would be 17 years instead of 32 years.

The defendant has been in federal custody since June 14, 2011 and he is scheduled to be released on July 16, 2034. He has served approximately 10 years and 6 months of this 324-month sentence, or slightly more than 27% of his sentence.

ANALYSIS

The defendant is currently 35 years of age. His PSR prepared in early 2013 reveals that he had a heart murmur at birth and experiences chest pains and loses his breath at times. Apart from this, none of the medical symptoms the defendant claims to exist at the present time are indicated in the PSR. The PSR does indicate a long history of evaluation for mental and emotional health with what can be best described as inconclusive results. The PSR also contains a suggestion that at times the defendant has been malingering. (See ECF No. 237, PSR, at ¶¶ 72, 73). Before trial, this court had the defendant evaluated and his private psychiatrist found him competent to stand trial. He has minimal criminal history and reports that he has no disciplinary infractions while incarcerated. According to this court's review,

22

he has no vocational or educational credits to report.

With this background, the court now turns to the ultimate question of whether the anti-stacking authorization of *McCoy*, together with this court's individualized assessment of the defendant's crimes, call for a reduced sentence as requested by the defendant. If sentenced today, the defendant would be facing a sentence of 17 years instead of 32 years. He has thus demonstrated an extraordinary and compelling reason for a sentence reduction. As explained further below, the court feels that this extraordinary and compelling reason, when combined with a review of the § 3553(a) factors, warrants this court's consideration of providing some relief to the defendant, although not all relief sought.

*Factors under 18 U.S.C. § 3553(a)*

The court now turns to a review of the § 3553(a) factors:

1. *Nature and Circumstances of the Offense*. The defendant participated in most serious criminal violations as set out in detail earlier in this order. The defendant benefitted significantly from the prosecutor's agreement to dismiss the remaining seven counts against him. The government ( through the same Assistant United States Attorney who prosecuted this case originally) now argues that had the government known that the defendant would not be facing a "stacked" § 924(c) sentence for the two counts of conviction, the government would never have agreed to drop so many other counts.[2] However, other district courts have rejected such arguments, suggesting that they require the court to engage in speculation and

---

[2] This may well be the reason that Congress expressly stated that the anti-stacking provision of the First Step Act was not retroactive. A retroactive application upsets settled bargains from years ago that were made in good faith.

this court adopts the rational employed in those decisions. *See United States v. Smith*, 39 F.Supp. 543 (W.D.Va 2019); *United States v. Steppe*, 3:16-cr-22 (W.D.Va., Apr. 20, 2021).

2. *History and Characteristics of Defendant*.   The defendant was 25 years old when he committed the instant crimes.  He is now approximately 35 years old and is serving his sentence at the FCI Edgefield with a scheduled release date of June 16, 2034.

The PSR sets out in greater detail the defendant's characteristics, as well as his criminal history and convictions.  He is single, having never marries and has two children. He reportedly earned a high school certificate in Columbia, South Carolina in 2005.  He was last employed at the Wild Wing Café.

*Post-Sentencing Conduct*

In regard to post-sentencing conduct, the defendant has one disciplinary infraction for "phone abuse."  He has taken a total of six educational/vocational courses.  These include two courses related to recreation and one related to AIDS awareness.

In regard to his release plans, the defendant asserts that many of his family members have created a plan to "keep [him] as well as the public safe should he be released."  He states that he has extensive community resources, is on social security disability, and has been a participant in a host of programs for the mentally and intellectually challenged.  He contends that his fiancé will assist him with his daily requirements and necessities.  He also lists numerous family members who are willing and able to assist in his care.

The court understands this argument, has carefully considered it, and must respectfully reject it.  To reward someone with early release because he is fortunate enough to have a

24

loving and supportive family would work to the disadvantage of another defendant, who committed the same crime under the same circumstances, who did not have family support. This would create a significant disparity in sentencing which the law should not recognize. Thus, although the court has carefully considered this argument, it must respectfully reject it.

3. *Seriousness of the Crimes.* As evidenced by the historical facts set out in the PSR involving the defendant's instant convictions, this court regards the defendant's crimes as very serious, fully supportive of a significant sentence. This case involved five members of a group who kidnaped, robbed and threatened multiple people during three armed robberies. In one such robbery, Turnipseed threatened one of the victims with his gun after the victim "bulked up" to Turnipseed. Turnipseed told the victim "Do you want to die a hero or live a cowboy?" (ECF No. 237, PSR at ¶37). In another robbery, Turnipseed discharged his firearm while fleeing the store (*Id*. at ¶41). In the same robbery, one of the victims gave a victim impact statement in which she outlines that she suffers from PTSD as a result of the robbery and having Turnipseed point the gun at her face (*Id*. at ¶ 46, 47). These actions are more than having a gun during two different drug sales, given the number of robberies committed by Turnipseed and his co-conspirators, the number of victims involved and the fact that the victims were kidnaped and held at gunpoint for several minutes with threats of being shot.

4. *Whether the Sentence Promotes Respect for the Law and Just punishment for the offense*. The court finds a significant sentence is necessary to promote respect for the law and just punishment.

5. *Whether the Sentence Affords Adequate Deterrence to Criminal Conduct*. The court finds that a significant sentence is necessary to provide both general and specific deterrents.

6. *Whether the Sentence Protects the Public from Future Crimes of the Defendant*. The court finds that a significant sentence is necessary to protect the public from future crimes of the defendant.

7. *Need to Avoid Unwarranted Sentencing Disparities*. This court has previously reduced the sentence of co-defendant Jamario Ford for reasons set out in this court's order of October 5, 2021 (ECF No. 547).

CONCLUSION

Although the defendant's offenses were extremely serious and involved at least three separate armed robberies, the court concludes that the defendant has demonstrated an extraordinary and compelling reason for relief under § 3582(c)(1)(A) regarding his stacked § 924(c) charges. That is, if the defendant were sentenced today, his sentence would be substantially lower as a result of the changes to the statute made by the First Step Act. The court reaches this conclusion after carefully considering the individualized circumstances of the case, and after considering the § 3553(a) factors.

The defendant's previously imposed sentence of 324 months is reduced to a total of 180 months, consisting of 84 months on Count 5 and 96 months on Count 9, to run consecutively to the sentence on Count 5. The defendant's term of supervised release remains at 3 years. All other provisions of the original judgment remain in full force.

To the extent that the sentence imposed herein on Count 9 could be considered a variance, the court determines that such action is appropriate considering the severity of the crimes at issue, the fact that the defendant attempted to obstruct justice, the fact that other counts of the indictment were dismissed, and all of the other § 3553(a) factors mentioned above.

IT IS SO ORDERED.

December 17, 2021                          Joseph F. Anderson, Jr.
Columbia, South Carolina                   United States District Judge